**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 777-11 |
| | ) | |
| AARON WILLIAMS | ) | HONORABLE DAVID H. COAR |

**MEMORANDUM OPINION AND ORDER**

Aaron Williams is one of eleven codefendants in this drug-trafficking case. He is charged with one count of possession with intent to distribute 500 grams or more of a substance containing cocaine. *See* 21 U.S.C. § 841(a)(1). Chicago police officers seized a kilogram of cocaine from Williams and codefendant Ennis Howard's vehicle during a traffic stop on July 16, 2008, and Williams moved to suppress the cocaine as the fruit of an illegal search.

Williams's motion is in an unusual procedural posture. In its response to the motion, the government advanced two arguments: *first*, the officers developed probable cause to search the vehicle during the traffic stop; *second*, the search was justified on the basis of probable cause known to DEA (at whose request the officers acted) by virtue of an ongoing wiretap investigation and surveillance of Williams and Howard shortly before the traffic stop. The court conducted an evidentiary hearing on Williams's motion on July 31, 2009, at which the government focused entirely on the traffic stop. Williams submitted the first post-hearing memorandum, in which he naturally focused on the evidence brought forth at the hearing. The government then reiterated its wiretap-and-surveillance argument in its post-hearing response; thus, it has advanced this argument only in responsive briefing, and Williams has not had an opportunity to address it.

Accordingly, the court grants Williams leave to address the government's argument that the officers had probable cause to search the vehicle based on DEA's wiretap investigation and surveillance. Williams shall file his written memorandum within 10 days, and the government shall have 7 days to respond.

In the present memorandum opinion and order, the court resolves the issues that were raised at the evidentiary hearing. The court finds that Officer Simon's account of the traffic stop was not credible and that the officers did not have probable cause for the search based on a seatbelt violation and subsequent sighting of marijuana in plain view. A final ruling on the motion to suppress will issue after due consideration of the merits of the government's wiretap-and-surveillance argument.

## FACTS

On July 16, 2008, Aaron Williams and codefendant Ennis Howard were arrested by Officers Joseph Simon and Slawomir Plewa of the Chicago Police Department. The arrest reports indicate that the officers "received information from a confidential source" that Williams and Howard's vehicle, a silver Chevy Suburban with Wisconsin plates, was seen departing from a narcotics transaction. The reports further indicate that the officers curbed the vehicle for "minor traffic violations" and that during the traffic stop, Officers Simon and Plewa observed a "loose green leaf like substance" on the center console and "two cigar like objects in the ashtray rolled up." Suspecting marijuana, the officers ordered Williams and Howard out of the vehicle and detained them. Officer Anderson arrived on the scene and recovered the suspected cannabis from the vehicle. Williams was then arrested, mirandized, and searched; two small bags of a "green leaf like substance" were discovered in his front left pants pocket. Following the arrest, the officers searched the vehicle and found a New Balance shoe box containing a "white powder

like substance" in the center of the rear seat.

Williams was cited by Officers Simon and Plewa for possession of cocaine and cannabis, and for failure to wear a seat belt. All state charges were subsequently dropped, and Williams was charged in the present case.

Three witnesses testified at the suppression hearing: Officer Daniel Gutierrez, Officer Joseph Simon, and Defendant Aaron Williams.

### *Officer Gutierrez's Testimony*

Officer Gutierrez is a Chicago police officer who was assigned to the DEA Task Force at the time of Williams's arrest. He testified that in 2007-08, DEA was investigating an alleged drug-trafficking organization involving Filiberto Hinojosa and other codefendants in this case. Pursuant to a Title III warrant, DEA wiretapped various telephones used by Hinojosa and others. Officer Gutierrez testified that, based on telephone calls intercepted on July 15 and 16, 2008, DEA agents believed that a narcotics transaction would take place at Hinojosa's alleged stash house on the 2700 block of North Monitor St., on July 16, 2008—but Officer Gutierrez never listened to any of the intercepted calls on which DEA's belief was based.

On the morning of July 16, 2008, Officer Gutierrez met with Officer Simon and other CPD officers to apprise them of a possible narcotics transaction at the North Monitor location. He asked the CPD officers to set up surveillance near the North Monitor location, wait for a description of the vehicle that departed following the presumed transaction, follow the vehicle, and find a reason to stop and search the vehicle and its passengers. Officer Gutierrez never instructed the officers on the details of DEA's alleged probable cause, and the ostensible reason for the stop would be left entirely to their discretion. DEA had a tactical reason for asking the CPD to initiate a traffic stop and subsequent search on the basis of whatever independent

probable cause they could "develop" on their own: DEA did not want to disclose that the source of its information was an ongoing wiretap.

Officer Gutierrez further testified that he was on surveillance near the North Monitor location on July 16, 2008. He saw a large silver or gold Chevy SUV with Wisconsin plates pull into the back alley. He heard, via radio communications from other agents, that two African American males exited the SUV, entered the house, returned to the SUV, and drove away. Officer Gutierrez repositioned himself to see the vehicle as it was leaving, informed Officer Simon of its direction by phone, followed the SUV until he saw the CPD officers make the stop, and drove by without participating in the stop.

### *Officer Simon's Testimony*

Officer Simon also testified that on the morning of July 16, 2008, he and other CPD officers met with Officer Gutierrez. Officer Gutierrez told them that DEA believed a transaction involving a "substantial amount" of narcotics might take place later that day at the North Monitor location. He asked the officers to go to the area of Diversey and Monitor and wait for further information regarding a vehicle they were to follow. Officer Gutierrez told them they would need to develop their own probable cause to stop and search the vehicle, since they would not be able to use any probable cause DEA might have had for "reporting purposes."

Officer Simon and his partner, Officer Plewa, identified the SUV from the information Officer Gutierrez relayed to them. They followed the SUV in an unmarked detective's car (a Crown Victoria); Officer Plewa drove and Officer Simon rode in the passenger seat. At first, they followed directly behind the SUV but did not observe the driver commit any traffic violations. And nothing about the vehicle itself provided grounds for a stop. So, while the SUV was headed east on Diversey, near Laramie, the officers pulled up along the passenger side to

observe the occupants; Officer Simon could not recall whether the windows of the SUV were up or down at the time. From his vantage point, Officer Simon could observe the passenger in the SUV, but he could only see a "profile" of the driver. In particular, Officer Simon could not determine whether the driver was wearing a seatbelt. Officer Simon testified that he did not believe that the passenger—later identified as Howard—was wearing a seatbelt, since he could not see a shoulder harness secured across the passenger's torso. He also testified that Officer Plewa did not believe the driver—later identified as Williams—was wearing a seatbelt. The officers did not stop the SUV at that point because Diversey was too congested, so they fell back and continued to follow behind the SUV as it headed east on Diversey and then north on Cicero.

The officers eventually stopped the vehicle near Cicero and Roscoe. Officer Simon approached the passenger side and Officer Plewa approached the driver side. Officer Simon testified that he and Officer Plewa both observed what they believed to be "residue" or "crumbs" of marijuana on the center console of the SUV, as well as two "cigar-like objects" that were "sticking out of the ashtray," which they believed to be consistent with marijuana use. On cross examination, Officer Simon was not sure whether the windows were up or down when he looked into the car and observed the "crumbs" and "cigar-like objects."

After finding what they believed to be marijuana in plain sight, the officers ordered Williams and Howard to exit the vehicle. By that time, another police car had pulled up and Officers Zambrano and Anderson had arrived on the scene. One of them found two bags of marijuana on the driver (i.e., Williams). Officer Simon walked Howard back to the Crown Victoria and Officer Plewa walked Williams back to one of the police cars. While Williams and Howard were detained in the officers' car(s), Officer Simon and some of the other officers searched the vehicle. In the back seat, they found a New Balance shoebox that contained a

"taped up brick like object." Subsequent laboratory testing confirmed that it was cocaine.

On cross examination, Officer Simon testified that he was aware, at the time of the stop, of Section 12-603.1(a) of the Illinois Vehicle Code, which prohibits an officer from searching or inspecting a vehicle, its contents, the driver, or a passenger when executing a traffic stop solely for failure to wear a seat belt.

### *Aaron Williams's Testimony*

Aaron Williams testified that he came to Chicago with Ennis Howard in Howard's SUV. Initially, Howard drove, but Williams took over the driving after they left the North Monitor location. Williams testified that they both wore their seatbelts the entire time they were in the vehicle. He did not notice Officers Simon and Plewa pull up next to them on Diversey, and he pulled over as soon as he noticed the lights flashing on a blue Crown Victoria behind him on Cicero. The windows in his vehicle were down; the officers approached and asked for his driver's license and insurance card. Williams handed his license to one of the officers, who immediately pulled him out of the vehicle, searched him, and detained him in the back of a police car (Howard was detained in a different police car) while the officers searched the vehicle. He was never asked to consent to the search of his person or the vehicle.

Williams testified that there were no "crumbs" or any other marijuana on the center console. There were two unsmoked marijuana cigars in the ashtray; the ashtray was closed, and the cigars were not sticking out or in any other way visible. Williams testified that he had closed the ashtray as soon as he realized he was being pulled over. He also admitted that he had two bags of marijuana in his pocket, which the officers discovered when searching his person.

On cross examination, Williams testified that he was aware the government intended to seek enhanced penalties because of his prior drug conviction.

## ANALYSIS

### *Credibility Determinations*

In Illinois, drivers and (most) passengers of motor vehicles must wear seatbelts. *See* 625 ILCS 5/12-603.1(a). Those who don't risk being pulled over by the police and cited for a petty offense. *See id.* at § 603.1(c). But a police officer "may not search or inspect a motor vehicle, its contents, the driver or a passenger solely because of" a driver or passenger's failure to wear a seat belt. *Id.* at § 603.1(f); 725 ILCS 5/108-1(3) (same); *accord Knowles v. Iowa*, 525 U.S. 113 (1998) (Fourth Amendment prohibits search of vehicle incident to traffic citation; pat down of occupant incident to citation permitted only upon reasonable suspicion occupant is armed and dangerous). So when a police officer effects a traffic stop on the basis of a seatbelt violation and ends up searching the vehicle, its passengers, and its parcels, the officer needs to point to some intervening event or observation that establishes enough probable cause—or reasonable suspicion, as the case may be—to justify whatever search was performed.

Officer Simon knew this to be the case when he curbed Williams for a seatbelt violation. In light of this, and having observed his testimony at the suppression hearing, the court does not find Officer Simon's account of the traffic stop to be credible.

Officer Simon's professed strategy for effecting the desired search and arrest makes little sense. According to his testimony, he approached the vehicle knowing that he lacked his own probable cause, even assuming Williams and Howard were not wearing their seat belts. He therefore approached the vehicle knowing that he would have to find something in plain view to justify a further search of the vehicle or its passengers. Thus, on his own account, Officer Simon enlisted luck to deliver the probable cause he needed but lacked—and luck of course came through for him. But to accept this account, the court would have to accept that Officer Simon

was prepared to let Williams and Howard be on their way with only a traffic citation—no search, no arrest—in the event that no contraband or weapons could be found in plain view.  That would have been remarkable, since the whole point of the traffic stop was to arrest Williams and Howard.  Simply put, Officer Simon was going to stop Williams and Howard one way or another, whether they committed any minor traffic violations or not; that, indeed, was his assignment.  His explanation for why he stopped Williams and Howard, therefore, cannot be fully candid, and either seatbelt infractions were not the basis for the stop or Williams and Howard were wearing their seatbelts after all.  It makes no difference which is in fact the case; the point is that Officer Simon was not candid and his testimony was not believable.

Officer Simon's account of the traffic stop would have been far more credible had he acknowledged the simple truth that he was going to stop Williams and Howard one way or another.  Instead of candor, however, Officer Simon relied entirely on the seatbelt-violation rationale for the traffic stop and a less-than-straightforward story about what each officer believed and observed to back it up.  The problem with being candid in this context is, of course, that Officer Simon needed to provide some basis for the stop without falling back on the probable cause he presumed DEA to have.  But the fact that he was in a bind in no way bolsters the credibility of his account; on the contrary, it underscores his strong incentives to tell a story like the one he told—whether or not it was true.

Most importantly, these failures of credibility vitiate the crucial element of Officer Simon's account: that, as luck would have it, the officers immediately noticed marijuana in two plain-view locations in the SUV, Williams and Howard apparently having made no attempt to close the ashtray or sweep away the "crumbs" before the officers arrived at their vehicle.  Now, Williams and Howard may have been fatally careless or too stoned to react sensibly, for all the

court knows. But there was no testimony or mention in the police reports of any signs of intoxication, and such explanations would in any event be far easier to credit if Officer Simon's earlier testimony had been believable. Williams, for his part, does not deny that he had two small bags of marijuana in his pocket and two unsmoked joints in the ashtray; he does not attempt to argue that evidence was planted. He claims only that he closed the ashtray before the officers arrived at the vehicle and that he didn't just leave marijuana sitting around, in plain view, for two approaching officers to see—while he had a kilogram of cocaine in the back seat.

Considering all the factors that bear on the credibility of Officer Simon's testimony—his manner of testifying; his incentives to tell a story like the one he told, which otherwise makes little sense; his objective of searching and arresting Williams and Howard on whatever grounds he could muster; and, as he would have it, his confident reliance on sheer luck to achieve that objective—the court cannot credit the essential lynchpin of his story, his wholly fortuitous discovery of marijuana in plain view. In the circumstances of this case, it is far more plausible that the officers found the marijuana while performing the search they were out to perform, one way or another.

### *Probable Cause Analysis*

Officer Simon and Plewa's traffic stop was nothing if not pretextual. The officers acted, ultimately, on probable cause they presumed DEA to have; their task, in large measure, was to help preserve the secrecy of the information on which it was allegedly based by "developing" probable cause of their own. This case illustrates the problems that arise when police officers try to paper over the underlying reasons for their actions. But pretext is one thing and probable cause is another; that is the central teaching of *Whren v. United States*, 517 U.S. 806 (1996). The question, as far as the Fourth Amendment is concerned, is whether there was an objective

rationale for a search or seizure, not whether an officer acted from ulterior motives or on the basis of pretextual reasons. The latter inquiry may of course yield relevant facts against which to judge the credibility of an officer's testimony—and in this case it has, to Williams's advantage. But Williams is not entitled to the suppression of evidence simply because the court does not believe Officer Simon's account of the traffic stop. *See, e.g.*, *United States v. Cervantes*, 19 F.3d 1151, 1154 (7th Cir. 1994) ("The exclusionary rule is intended to protect the privacy and property rights of the citizen, rather than to punish law enforcement officers for trickery, deceit, or even telling lies under oath."). The court must determine whether officers nevertheless had an objective rationale for the search that yielded the cocaine Williams seeks to suppress.

Williams concedes that the lawful discovery of marijuana in his pocket would justify the vehicle search that yielded the cocaine. He would be arrested upon that discovery, and it would be reasonable for the officers to believe that a search of the vehicle, including the New Balance shoebox in the back seat, might reveal further evidence relevant to the crime of arrest. *See Arizona v. Gant*, 556 U.S. __, 129 S. Ct. 1710, 1719 (2009) (citing *Thornton v. United States*, 541 U.S. 615, 632 (2004)). Thus, a vehicle search incident to the arrest would be justified on the evidence-preservation rationale of *Thornton*. *See id.* The critical inquiry, therefore, is whether the officers had an objective rationale for at least a pat-down search of Williams, since even a routine pat down would likely have uncovered the marijuana in his pocket.

In its post-hearing memorandum, the government contends that a pat-down search of Williams was justified by a concern for the officers' safety, since the officers had, at a minimum, a "reasonable suspicion" that Williams might be armed. *See Terry v. Ohio*, 392 U.S. 1, 20 (1968). He had just purchased a substantial amount of cocaine—or so the officers had been told—and "cocaine trafficking [is] a crime infused with violence." *See United States v.*

*Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003) (quotation and citation omitted). So the officers could have frisked Williams for weapons; in due course they would have found the marijuana in his pocket and legally seized it as contraband. *See id.* (officer may seize non-threatening contraband detected by sight or touch during weapons frisk). Then they could have searched the vehicle incident to Williams's arrest for possession of marijuana.

*If* the officers had at least a reasonable suspicion that Williams had just purchased a substantial amount of cocaine, they also had a legitimate basis for a weapons frisk; to that extent, the government's argument is correct. Indeed, the government can *only* establish an objective rationale for a pat down or any other search by relying on DEA's presumed information—that is the obvious implication of Officer Simon's failure to present a credible basis for "independent" probable cause. Without relying on DEA's information, the alleged seatbelt violation would not even justify a pat-down search; a driver's failure to wear a seatbelt is not enough to ground a reasonable suspicion that he or she might be armed, and there are no other "articulable facts" in the record that would ground any such suspicion. *See Knowles*, 525 U.S. at 118 (pat down during stop for traffic citation subject to *Terry* requirements). The government is right back where it started, before it solicited the machinations of the CPD.

In both of its memoranda, the government relies on the so-called collective-knowledge or common-knowledge doctrine to impute DEA's alleged probable cause to Officers Simon and Plewa. This doctrine allows officers to rely on probable cause or reasonable suspicion known to other officers without personally knowing all the facts on which it is based. *See, e.g.*, *United States v. Groves*, 559 F.3d 637, 641 (7th Cir. 2009); *United States v. Rodriguez*, 831 F.2d 162, 165 (7th Cir. 1987) (based on surveillance and wiretaps, DEA had reasonable suspicion defendant was a drug dealer and requested traffic stop by CPD on this basis). Thus, if DEA had

probable cause or reasonable suspicion based on intercepted telephone calls and surveillance of the North Monitor location on July 16, 2008, Officers Simon and Plewa could have acted on Officer Gutierrez's request and effected any search DEA's information justified.

The problem, however, is that Williams has not had an opportunity to respond to this argument, as the government has only raised it in responsive memoranda. At the suppression hearing, the government relied entirely on the validity of the traffic stop and subsequent sighting of marijuana in plain view; it did not pursue the collective-knowledge argument or present any admissible evidence in support of it.[1] The government's memoranda do refer to an extensive affidavit by DEA Special Agent James C. Chupik, which was filed in support of the criminal complaint in this case. The court therefore cannot conclude—at this point—that the government has failed to carry its burden of showing that the evidence was legally obtained. *See United States v. Longmire*, 761 F.2d 411, 416 (7th Cir. 1985) (where officer effects stop or search at another's request, burden is on government to "adduce proof" that requesting officer had sufficient rationale for the action taken if defendant satisfies initial burden in motion to suppress); *see also United States v. Ienco*, 182 F.3d 517, 528 (7th Cir. 1999) (once defendant makes initial showing sufficient to warrant evidentiary hearing, burden shifts to the government to show disputed evidence was legally obtained). Whether or not the government can carry that burden on the basis of the evidence set forth in Agent Chupik's affidavit is a question that Williams should have a full and fair opportunity to address.

To recapitulate: because the court does not credit Officer Simon's account of the traffic stop, the court finds that there was no probable cause to search the vehicle based on the alleged

---

[1] The government proffered transcripts of (translations of) intercepted telephone calls during Officer Gutierrez's testimony, but Officer Gutierrez had previously testified that he had not listened to any of those calls. In light of that testimony, and after reviewing the transcripts, the court concluded that the government lacked a proper basis for admitting them into evidence and declined to do so.

seatbelt violation and subsequent sighting of marijuana in plain view.[2]  If that were the government's only basis for probable cause, the evidence would be suppressed.  But a final ruling on the motion would be premature until Williams has had a chance to respond to the government's collective-knowledge argument based on its wiretap and surveillance evidence.

## CONCLUSION

For the foregoing reasons, the court grants Williams leave to respond to the government's argument that the officers had probable cause for the search that yielded the cocaine based on DEA's wiretap investigation and surveillance on July 16, 2008.  Williams shall submit a written memorandum within 10 days.  The government shall have 7 days thereafter to respond.  A final ruling on the motion to suppress will issue accordingly.

Enter:

/s/ David H. Coar

_____

David H. Coar

United States District Judge

**Dated: November 3, 2009**

---

[2] The court notes that this finding is based on the illegality of the search under federal, not Illinois, law.  The analysis of Illinois law was relevant to the court's determination of the credibility of Officer Simon's testimony rather than to the question whether Williams is entitled to suppression of the cocaine.